UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GABRIEL M. KRUSE,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>BANSUAN, et al.,<br><br>　　　　　Defendants. | Case No. 1:19-cv-00005-NONE-EPG (PC)<br><br>FINDINGS AND RECOMMENDATIONS RECOMMENDING THAT DEFENDANT BANSUAN'S MOTION TO DISMISS BE GRANTED; AND THAT PLAINTIFF'S CLAIM FOR DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS AGAINST DOE DEFENDANTS BE DISMISSED<br><br>(ECF Nos. 1 & 18)<br><br>OBJECTIONS, IF ANY, DUE WITHIN TWENTY-ONE (21) DAYS |

　　　　Gabriel Kruse ("Plaintiff") is a former state prisoner proceeding *pro se* and *in forma pauperis* in this civil rights action filed pursuant to 42 U.S.C. § 1983.  Plaintiff filed the complaint commencing this action on January 2, 2019.  (ECF No. 1).  Plaintiff's complaint generally alleges that he has been positive for Hepatitis C for almost 20 years and should be receiving the "Harvoni Treatment" from prison officials.

　　　　On July 11, 2019, this Court screened Plaintiff's complaint and found that Plaintiff's Eighth Amendment claims for deliberate indifference to serious medical needs could proceed against Dr. Bansuan and certain unnamed Doe individuals.  (ECF No. 7).  On August 28, 2019, the assigned district judge adopted the undersigned's findings and recommendations and ordered that "[a]ll claims and defendants are dismissed, except for Plaintiff's Eighth Amendment claims for deliberate indifference to serious medical needs against Dr. Bansuan

1

1  and Doe Defendant(s)."  (ECF No. 16, at p. 2).

2       On September 6, 2019, Defendant Bansuan filed a motion to dismiss.  (ECF No. 18).
3  Plaintiff filed an opposition to Defendant's motion on January 15, 2020.  (ECF No. 26).
4  Defendant filed a reply on January 21, 2020.  (ECF No. 27).

5       Defendant argues that he provided treatment to Plaintiff according to prison health
6  services protocol, and that the regular consultations, monitoring, and services he provided
7  consistent with that protocol cannot constitute a claim for deliberate indifference to serious
8  medical needs under the appropriate legal standards.

9       For the reasons stated herein, the undersigned recommends granting Defendant's
10 motion to dismiss.  Additionally, based on the reasoning in this order, the Court also
11 reconsiders its screening order as to the unidentified Doe Defendants and recommends
12 dismissing Plaintiff's claims against them as well.

13 **I.  SUMMARY OF PLAINTIFF'S COMPLAINT**

14      Plaintiff is an inmate at Valley State Prison ("VSP").

15      Plaintiff was diagnosed with Hepatitis C almost twenty years ago.  He was remanded
16 into the custody of the California Department of Corrections and Rehabilitation ("CDCR") on
17 January 14, 2014.  Since February 16, 2014, Plaintiff has continuously requested treatment for
18 Hepatitis C, and his requests have continuously been denied.

19      The disease has progressed, and the symptoms have become progressively worse.
20 Plaintiff is suffering fatigue, nausea, loss of appetite, upset stomach, and weight loss.  The
21 fatigue is so bad that Plaintiff is exhausted by the smallest exertion, such as showering and
22 cleaning his bed area.  Concentrating becomes a challenge at times.  Plaintiff's urine has
23 become very dark, despite constant hydration throughout the day.  Plaintiff has sleepless nights,
24 and often wakes up drenched in sweat.  Plaintiff's weight often fluctuates, and most of the time
25 he does not have much of an appetite.  Plaintiff almost always has an upset stomach.

26      CDCR and Valley State Prison medical department/staff are fully aware that Plaintiff
27 has a serious Hepatitis C condition and is in need of the Harvoni treatment.  Plaintiff has
28 increasing FIB 4 score levels, which are above the criteria limit for the treatment.

Any person infected with Hepatitis C can ultimately experience death if he or she is not effectively treated and/or their FIB 4 score levels continue to increase with escalating symptoms.

Medical staff shared crucial information with Plaintiff, as follows: "(1) Hepatitis C is monitored and managed by Hep C Clinic via telemedicine at headquarters run by Dr. Carmichael; (2) Patient has a history of Hep C, complains of feeling tired with no energy, fatigue, nausea, weight loss, dizziness, tender abdomen, joint weakness, instability in walking and daily concerns about Kruse's health and welfare; (3) Unable to calculate most recent Fib 4 score, because the platelet count is unknown; (4) patient agreed to have another set of blood work[]; (5) Patient is educated on risk of uncontrolled disease increasing up and including the possibility of death; and (6) Patient wants to be treated for Hepatitis C.  Explained to the patient that everybody is going to be treated.  However, because of the volume of patients or inmates with Hep C, providers can only do so much."

In 2018, Plaintiff continued to seek treatment, but to no avail.  He had lots of communication with Valley State Prison's medical department, many RN appointments, and many labs were taken, but he has not gotten closer to getting the Harvoni treatment.

On January 31, 2018, Plaintiff wrote to the Prison Law Office ("PLO").  He sent copies of documents showing two years of delays and denials, a lack of treatment, and progressive Hepatitis C symptoms.

On March 10, 2018, Plaintiff received a form letter and note from the PLO to the California Correctional Health Care Services ("CCHCS") & Receiver's Office of Legal Affairs, requesting Plaintiff's treatment level and asking when Plaintiff would be treated.

On or about April 20, 2018, Plaintiff received a response from the PLO regarding the PLO's request to the CCHCS & Receiver's Office of Legal Affairs.  Enclosed was a memo dated April 16, 2018, stating that Plaintiff would be treated if he filed a CDC 7362 Medial Request.  The memo was cced to: defendant Kyle Lewis, Deputy Attorney General/CDCR Health Care; T. Gilevich, Attorney V, CCHCS Office of Legal Affairs; Mae Ackerman-Brimberg, Prison Law Office; and defendant Dr. Virk, Chief Medical Executive of VSP.

On or about April 26, 2018, Plaintiff was seen by Nurse Godina. Plaintiff explained all his symptoms, requested Hepatitis C treatment, and provided her with a copy of the memo. Plaintiff's condition was serious enough that she called defendant Dr. Bansuan, a primary care physician, for instructions. Dr. Bansuan instructed her to order labs and make Plaintiff a primary care physician appointment.

The labs were done April 30, 2018.

On May 15, 2018, Plaintiff had a tele-med appointment with Dr. Bansuan. Plaintiff explained his symptoms and that they have become progressively worse. Plaintiff discussed the seriousness of his condition with Dr. Bansuan and told him about the memo. Dr. Bansuan attempted to direct LVN Brenes on how to perform an abdominal check. LVN Brenes told him that she did not know how to do it, but Dr. Bansuan said "don't worry I'm watching. Push on the upper right Quadrant – does it feel tight or overally [sic] firm[?]" LVN Brenes said "it[']s a little tight." Dr. Bansuan asked "how tight," to which LVN Brenes responded "I don't know, I'm not comfortable doing this." Dr. Bansuan stated "don't worry, he's fine, if it was overly firm you would know." Dr. Bansuan then told Plaintiff that he was ok, and could go.

Plaintiff asked about the Treatment Selection Request ("TSR"), which was referred to in the memo. Dr. Bansuan then checked Plaintiff's FIB 4 score. He stated "you don't qualify for treatment; Yes, that[']s what I'm going by, so I didn't order all the labs, so I don't have your C.B.C. levels; so I can't recalculate them now." Plaintiff asked what was going to be done, and Dr. Bansuan said he would reorder the labs and see Plaintiff again in thirty days.

Plaintiff was seen by Dr. Bansuan again on June 19, 2018. Plaintiff discussed his symptoms with Dr. Bansuan. Plaintiff also requested that Dr. Bansuan file a TSR, and asked what his FIB 4 score was. Dr. Bansuan first stated .90, then stated 1.59 (he had concerns regarding whether he was calculating it correctly). Then, he said that he would see Plaintiff in thirty days and ordered another set of labs. He said he would speak with and consult with his colleagues, and stated that he wanted to start the Harvoni treatment.

On August 1, 2018, Plaintiff was seen again by Dr. Bansuan. Dr. Bansuan stated that his boss, Dr. Virk, would not allow him to file a TSR unless Plaintiff's FIB 4 score met the

treatment protocol, which was set forth by the Hep C committee in Sacramento.

On August 17, 2018, Plaintiff had an appointment with Nurse Thao. Nurse Thao stated that there was "really nothing I can do; but, hopefully your labs will get so much worse and then you can possibly be treated."

On August 29, 2018, Dr. Bansuan said he spoke to Dr. Virk, and that "I was told not to file RFS Order or a (T.S.R.), order to Sacramento; on the 'Memo.'"

On October 29, 2018, Plaintiff had another appointment with Dr. Bransaun. Dr. Bransaun told Plaintiff that he "spoke with the Hep C Panel @ Sacramento, and I made them aware of your situation. Now, they are fully aware of the 'NEED' for treatment. Per your labs; your treatment level is 3, and everyone is going to be treated; but, they'll treat the level 1's, the level 2's; then the level 3's, like yourself." Plaintiff was not given a definitive date that he would be treated.

As of the date Plaintiff signed his complaint, Plaintiff still had not received the Harvoni treatment.

Plaintiff alleges that delayed or denied treatment is an act of deliberate indifference, as was having an LVN perform an abdominal examination.

Additionally, Plaintiff alleges that the medical department at Valley State Prison has failed to follow medical protocols and the mandate to ensure that all inmates receive adequate care and treatment. CDCR is aware of Plaintiff's need for the Harvoni treatment and care of his Hepatitis C, and has collected medical data and information determining that treatment of his Hepatitis C is medically necessary. However, Plaintiff is denied the necessary Hepatitis C treatment, which puts Plaintiff's life at risk.

Plaintiff alleges that disorganization and dysfunction in a medical program can amount to deliberate indifference, as it has in this case. Plaintiff's condition and symptoms are visible and getting worse, but Plaintiff is not being provided with the Harvoni treatment.

Moreover, Defendants knowingly allowed factors unrelated to Plaintiff's medical needs to interfere with his treatment. This includes staffing so inadequate that medical staff lacks the time to effectively tend to inmates' medical needs. There are procedures that do not allow

proper diagnosis and treatment, which prevents care providers from being able to make a professional judgment. There is failure to inquire into essential facts that are necessary to make a professional judgment. There is a persistent backlog for appointments to see a primary care physicians, and serious access to care issues. There is a severe shortage of primary care physicians and nurses. The medical record keeping borders on non-existent. Treatment is restricted or denied based on cost.

Prison officials often ignored or delayed treatment, making Plaintiff unable to make his medical problems known to medical staff without being humiliated or belittled.

There are policies in place restricting necessary treatment and care, that are initiated by medical supervisors and staff. Therefore, they should be held liable.

## II.     LEGAL STANDARDS

### A.     Deliberate Indifference to Serious Medical Needs

"[T]o maintain an Eighth Amendment claim based on prison medical treatment, an inmate must show 'deliberate indifference to serious medical needs.'" Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)). This requires Plaintiff to show (1) "a 'serious medical need' by demonstrating that 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain,'" and (2) that "the defendant's response to the need was deliberately indifferent." Id. (quoting McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th Cir. 1992) (citation and internal quotations marks omitted), overruled on other grounds by WMX Technologies v. Miller, 104 F.3d 1133 (9th Cir. 1997) (*en banc*)).

Deliberate indifference is established only where the defendant *subjectively* "knows of and disregards an *excessive risk* to inmate health and safety." Toguchi v. Chung, 391 F.3d 1051, 1057 (9th Cir. 2004) (emphasis added) (citation and internal quotation marks omitted). Deliberate indifference can be established "by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." Jett, 439 F.3d at 1096 (citation omitted). Civil recklessness (failure "to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known") is

insufficient to establish an Eighth Amendment violation.  Farmer v. Brennan, 511 U.S. 825, 836-37 & n.5 (1994) (citations omitted).

A difference of opinion between an inmate and prison medical personnel—or between medical professionals—regarding appropriate medical diagnosis and treatment is not enough to establish a deliberate indifference claim.  Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989); Toguchi v. Chung, 391 F.3d 1051, 1058 (9th Cir. 2004).  Additionally, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.  Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."  Estelle, 429 U.S. at 106.  To establish a difference of opinion rising to the level of deliberate indifference, a "plaintiff must show that the course of treatment the doctors chose was medically unacceptable under the circumstances."  Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996).

### B. Motions to Dismiss

In considering a motion to dismiss, the Court must accept all allegations of material fact in the complaint as true.  Erickson v. Pardus, 551 U.S. 89, 93-94 (2007); Hosp. Bldg. Co. v. Rex Hosp. Trustees, 425 U.S. 738, 740 (1976).  The Court must also construe the alleged facts in the light most favorable to the plaintiff.  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), abrogated on other grounds by Harlow v. Fitzgerald, 457 U.S. 800 (1982); Barnett v. Centoni, 31 F.3d 813, 816 (9th Cir.1994) (per curiam).  All ambiguities or doubts must also be resolved in the plaintiff's favor.  See Jenkins v. McKeithen, 395 U.S. 411, 421 (1969).  In addition, *pro se* pleadings "must be held to less stringent standards than formal pleadings drafted by lawyers."  Hebbe v. Pliler, 627 F.3d 338, 342 (9th Cir. 2010) (holding that *pro se* complaints should continue to be liberally construed after Ashcroft v. Iqbal, 556 U.S. 662 (2009)).

A motion to dismiss pursuant to Rule 12(b)(6) operates to test the sufficiency of the complaint.  See Iqbal, 556 U.S. at 679.  "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the … claim is and the grounds upon which it rests.'" Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (alteration in original) (quoting

Conley v. Gibson, 355 U.S. 41, 47 (1957)). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer, 416 U.S. at 236 (1974).

The first step in testing the sufficiency of the complaint is to identify any conclusory allegations. Iqbal, 556 U.S. at 679. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 678 (citing Twombly, 550 U.S. at 555). "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (citations and internal quotation marks omitted).

After assuming the veracity of all well-pleaded factual allegations, the second step is for the court to determine whether the complaint pleads "'a claim to relief that is plausible on its face.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. 662 at 678 (citations omitted). "Determining whether a complaint states a plausible claim for relief … [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 679.

### III. SCREENING ORDER

The Court's screening order allowed Plaintiff's claims for deliberate indifference to serious medical needs against Dr. Bansuan and unnamed prison officials to proceed past screening. (ECF No. 7). The Court reviewed the legal standards, and then applied them to Dr. Bansuan as follows:

> Finally, Plaintiff sues Dr. Bansuan. Plaintiff alleged that he received a memo from CCHCS and the Receiver's Office of Legal Affairs, stating that Plaintiff would be treated if he appropriately requested it. Plaintiff attempted to request the treatment, but instead of providing it Dr. Bansuan had an unqualified individual conduct an abdominal exam and then told Plaintiff he was "fine."

> Construing Plaintiff's complaint liberally, the Court finds that Plaintiff has stated a claim against Dr. Bansuan sufficient to proceed past screening.

(Id. at 11).

In the screening order, the Court also allowed a claim against certain Doe Defendants as follows:

> [T]he Court finds that Plaintiff has also sufficiently alleged a claim against certain unnamed individuals. According to Plaintiff's allegations, it was determined that he has a serious medical need, the Harvoni treatment can meet that need, and Plaintiff is supposed to get the Harvoni treatment. However, for non-medical reasons, Plaintiff was not provided with the treatment. Plaintiff refers to persons giving directions to medical professionals regarding such treatment, who did not allow Plaintiff to receive the treatment, but does not state their names and titles.
>
> As Plaintiff has sufficiently alleged that these unnamed prison official defendants decided that Plaintiff would not be treated (or that, for non-medical reasons, the treatment would be delayed), despite the fact that they knew Plaintiff had a serious medical need for treatment (he was placed on a list for treatment because he needed treatment), the Court finds that Plaintiff has stated an Eighth Amendment deliberate indifference claim against those persons within the prison system who were responsible for approving or allowing such treatment and who gave directions preventing Plaintiff from receiving such treatment.

(Id.).

## IV. DEFENDANT'S MOTION TO DISMISS

### A. Defendant's Motion

In his motion to dismiss, Defendant argues:

> Plaintiff's claim is that he requested Hepatitis C treatment, but instead of issuing Plaintiff the requested treatment, an unqualified nurse was allowed to conduct an abdominal examination resulting in a determination that Plaintiff was "fine." (Screening Order, ECF No. 7 at 11.) As an initial matter, there are no facts pled that demonstrate Plaintiff was permitted to bypass all preliminary examinations, and receive the TSR for Hepatitis C treatment. Instead, as intended and set forth by protocol, Plaintiff received continual monitoring for his symptoms. (*See* ECF No. 1 at 26, 27.) And, based on his metrics—and the protocols attached to the complaint—he was placed in the corresponding group for Hepatitis C treatment. (*Id.* at 12.) This is not deliberate indifference.
>
> Plaintiff's complaint is devoid of facts indicating that Dr. Bansuan based his treatment plan on the May 2018 examination by the nurse and the complaint

9

> does not demonstrate that Dr. Bansuan ceased following up with Plaintiff based on the allegedly deficient examination. Indeed, Plaintiff's pleadings demonstrate the *opposite*. Following the examination by the nurse and the guided assessment from Dr. Bansuan, Dr. Bansuan reviewed Plaintiff's treatment plan four more times in the following five months, and updated Plaintiff on his lab work. (ECF No. 1 at 27.) At the same May 2018 appointment, Plaintiff was notified of his FIB-4 score (*id.*), and the documents attached to the complaint demonstrate that a FIB-4 score above 1.45 was necessary to elevate Plaintiff's care to the next step—a Fibroscan or liver biopsy (*id.* at 11). Without pleading that Dr. Bansuan's care was compromised following the nurse's examination, the delegation of an abdominal examination to a supporting nurse is insufficient to state a deliberate indifference claim. *See McLennan v. Oregon Dept. of Corrections*, No. 2:14-CV-755-SL, 2015 WL 4488151, at *6 (D.Or., 2015) (finding no deliberate indifference where plaintiff alleged nurses performed duties of doctor and plaintiff faced further irreparable injury).
>
> Similarly, the complaint lacks facts demonstrating that a physical examination of the patient's abdomen is determinative of the Hepatitis C treatment plan. And it would be beyond the purview of the Eighth Amendment for Plaintiff to plead that a difference in the choice of care states a claim. *See Toguchi*, 391 F.3d at 1058. The documents attached to the complaint indicate that labs and objective metrics determine the category of care a patient is to receive. (*See* ECF No. 1 at 8-22.) Indeed, Plaintiff's FIB-4 score was 1.36 on May 15, 2018 (ECF No. 1 at 26), which placed Plaintiff in the lowest risk group (*see id.* at 12). Based on information relayed to Plaintiff at the same appointment, Dr. Bansuan advised him that he was simply not a candidate for immediate intervention according to CDCR treatment protocols. (*Id.* at 26, 27.) Plaintiff's repetitive pleading of the FIB-4 score undermines any credible assertion that the abdominal examination was determinative of his treatment regimen. As it stands, the abdominal examination was a superfluous review of Plaintiff's liver condition which had no bearing on Plaintiff's ensuing course of care. Plaintiff falls short of pleading a deliberate-indifference claim.

(ECF No. 18-1, at pgs. 4-5) (footnotes omitted). Defendant also argues, in the alternative, that he is entitled to qualified immunity. (Id. at 5-8).

**B. Plaintiff's Opposition**

Plaintiff argues in his response that officials disregarded a risk to his health (Hepatitis C is a serious disease) that was known and obvious. (ECF No. 26, at p. 2). Failure to treat Hepatitis C has been a repeated pattern of conduct. (Id. at 3). Many inmates were denied due to economic or monetary reasons, while CDCR set unrealistic criteria for an inmate to "qualify" for the treatment. (Id.).

Plaintiff claims that one test met CDCRs standards, showing a FIB-4 metric of 1.59, well above the treatment limits.  (Id. at 4).  Defendant had actual knowledge of the 1.59, yet failed to provide treatment.  (Id.).

Plaintiff concludes that because CDCR officials and staff, including but not limited to Defendant Bansuan, knew of Plaintiff's Hepatitis C (a serious medical condition), with a FIB-4 score of 1.59 (well above the level that qualifies for elevated care, or any care for that matter), and acted without care or regard to the condition, Defendant's motion to dismiss must be defeated.  (Id. at 5).

## V.   ANALYSIS

As an initial matter, the Court agrees that supervising a nurse for an abdominal examination does not itself establish deliberate indifference to serious medical needs.  The Court appreciates that, even according to Plaintiff's complaint, Defendant Dr. Bansuan engaged in a much more thorough evaluation of Plaintiff's risk factors, including multiple lab results, and did not base his opinion on the abdominal examination alone, if at all.

The more difficult question is whether Plaintiff's complaint established, as the Court found in its screening order, that Defendant Bansuan or any Doe defendant disregarded direction that Plaintiff was qualified for the Harvoni treatment based on non-medical reasons.

With this in mind, the Court has reviewed Plaintiff's allegations against Defendant Bansuan and the Doe defendants in detail, which are quoted verbatim below:

> On/or about 4/20/18, received response from the P.L.O., about their request for review of medical treatment by (CCHCS) California Correctional Health Care Service.  Enclosed was a "MEMO" dated April 16, 2018," stating I would be treated, if I filed a CDC 7362 Medical Request-requesting it.
>
> On 4/26/18, Seen by Nurse Godina, explained all symptoms.…  Provided her with copy of memo dated 4/16/18, I requested Hep C treatment; condition was severe enough that she called (PCP) Primary Care Physician - Dr. Bansuan, for instructions.  He instructed her to order labs and make Plaintiff, a (PCP) appointment.
>
> On 4/30/18, Labs were done.
>
> On 5/15/18, (PCP) appointment with Dr. Bansuan, explined [sic] symptoms of

11

over a year and that they've become progressively worse.  Discussed the seriousness of my condition and after seeking legal action to receive treatment, I had received a 'Memo' dated 4/16/18, from (CCHCS) Office, stating that "should you desire treatment, you should initiate a request for the process at this appointment and this would allow for him to file a (T.S.R) Treatment Selection Request to Headquarters for review….

Continueing [sic] at appointment on "Tele-Med" … I ask about the (T.S.R.).  He then said "let me check your Fib 4 score".  As Dr. Bansuan, checked for my FIB 4 Score, on the computer, then he says "its 1.36.  He then stated "<u>you don't qualify for treatment</u>; Yes, that's what I'm going by, so I didn't order all the labs, so I don't have your C.B.C. levels; so I can't recalculate them now".  I asked what was going to be done?  He responded saying [] he would reorder the labs and see me again 30 days.

On 6/17/18, filed CDC 7362 Medical Request, #5469203, as symptoms were still getting worser [sic] and 30 days, had passed.

On 6/18/18, On RN appointment; I was told that I would see the Doctor Tomorrow.

On 6/19/18, Seen Dr. Bansuan, discussed symptoms and Kruse, requested that Bansuan file a (T.S.R.); and asked what my FIB 4 Score was?  Dr. Bansuan, at first stated .90; then he stated 1.59.  He had concerns on whether he was calculating it correctly.  Then, he said that he would see me in 30 days and ordered another set of labs.  He said he would speak with and consult with his colleagues and what the Hep C Treatment Protocol was; then he stated that he wanted to start 'Harvoni' Treatment.

On 8/1/18, seen by Dr. Bansuan, who stated "his boss, Dr. Virk, would not allow him to file a (T.S.R.); unless my FIB 4 Score meet the treatment Protocol, set forth by the Hep C Committee in Sacramento.

…

On 8/29/18, Banuan, said he spoke to Dr. Virk, saying <u>"I was told not to file RFS Order or a (T.S.R.), order to Sacramento; on the "memo"</u>.

On 10/29/18, an appointment with Dr. Bansuan, stated "I spoke with the Hep C Panel @ Sacramento and I made them aware of your situation.  Now, they are fully award of the "NEED" for treatment.  Per your labs; your treatment level is 3, and everyone is going to be treated; but, they'll treat the level 1's, the level 2's, then the level 3's, like yourself."  Plaintiff was not given a definitive time or date that he would be treated.

…

> As of today's date, Plaintiff Kruse, is no closer to receiving 'Harvoni Treatment" for his on-going and continuous pain and suffering - Hep C disease, which can be fatal without effective treatment.

(ECF No. 1, at pgs. 25-28).

Plaintiff also attached as exhibits some documents related to how patients are selected for treatment. According to one document, if the FIB4 score is less than 1.45: "Unlikely to have significant liver fibrosis," and "Do not order FibroScan[] or liver biopsy." (Id. at 11). If FIB4 is greater or equal to 1.45, but less than 3.25: "*Cannot accurately predict level of liver fibrosis*," and "Order FibroScan[] or liver biopsy." (Id.). Based on that scan, "Patient is eligible for HCV treatment if Fibrosis Stage 0-3, or if Fibrosis Stage 4 but patient does not have decompensated cirrhosis." (Id. at 11). There is also a document regarding HCV Treatment Prioritization, explaining "Due to the significant number of patients eligible for treatment, patients at highest risk for complication or death if they remain untreated will be prioritized to receive HCV treatment first." (Id. at 12). Level 1 is the highest risk group, with various clinical examples. Level 2 is Medium risk group. Level 3 is lowest, which includes "Any previous Fibroscan or liver biopsy demonstrating stage 0-1 fibrosis" and "Does not meet any priority group 1 or 2 criteria." (Id.).

It is also worth noting, as Defendant emphasized, that elsewhere in the document it states: "Hepatitis C treatment is not an emergency. The liver damages/scar tissue happens over many years, and some people never get much damage or scarring." (Id. at 22).

Based on a careful reading of Plaintiff's complaint, the Court agrees with Defendant that Plaintiff's complaint has failed to state a claim for deliberate indifference to serious medical needs against Defendant Bansuan. Although the Court's screening order held a claim based on Defendant Bansuan's delegated abdominal inspection and saying Plaintiff was "fine," a closer review of Plaintiff's complaint, with explanation from the documents, shows that Defendant Bansuan followed the protocols set forth in the CDCR documentation. He repeatedly ordered lab tests, which are the first set of criteria to evaluate. Those lab scores initially showed a score of 1.36, which according to the protocols indicate "Unlikely to have significant liver fibrosis," and "Do not order Fibroscan or liver biopsy." According to

Plaintiff's complaint, when asked about his score at a later date, "Dr. Bansuan, at first stated .90; then he stated 1.59.  He had concerns on whether he was calculating it correctly."  He ordered further labs, and also consulted with "his boss, Dr. Virk, [who] would not allow him to file a (T.S.R.); unless [Plaintiff's] FIB 4 Score meet the treatment Protocol, set forth by the Hep C Committee in Sacramento."  Then, at a later appointment, Defendant Bansuan stated "I spoke with the Hep C Panel @ Sacramento and I made them aware of your situation.  Now, they are fully award of the 'NEED' for treatment.  Per your labs; your treatment level is 3, and everyone is going to be treated; but, they'll treat the level 1's, the level 2's, then the level 3's, like yourself."  This last note shows that Defendant Bansuan again took action based on Plaintiff's health concerns.

Upon re-reading this complaint in connection with the parties' briefs, it appears that Plaintiff is not claiming that some higher CDCR official told Plaintiff that he qualified for Harvoni treatment, but that Dr. Bansuan failed to provide it.  Rather, Plaintiff contends that Dr. Bansuan complied with CDCR's protocols for providing Harvoni treatment, but Plaintiff disagrees with those protocols.  Plaintiff concedes that he fit the criteria for a "Level 3" patient, which is the lowest risk group, but nevertheless insists on Harvoni treatment immediately.  In other words, Plaintiff contends that the prison health care system should not be permitted to prioritize patients at all, and everyone who would benefit from Harvoni treatment should receive it immediately.

Plaintiff's allegations not state a claim against Defendant Bansuan.  Defendant Bansuan, according to Plaintiff's complaint, sought the necessary lab work, applied the criteria given by CDCR, consulted with multiple health professionals, and followed their recommendations.  This care was not deliberately indifferent.  Instead, even taking all Plaintiff's facts as true, this care shows deliberate and careful treatment according to established protocols.  Thus, Defendant's motion should be granted because Plaintiff's complaint, even if true, does not establish a constitutional claim for deliberate indifference to serious medical against Defendant Bansuan.

Although Defendant Bansuan did not request dismissal of the claim against the

remaining Doe Defendants, the Court's reasoning in this order also calls into question the Court's similar reasoning in its screening order as to those Defendants.[1]  Again, in the Court's screening order, the Court allowed a claim against certain Doe Defendants based on finding that "Plaintiff has sufficiently alleged that these unnamed prison official defendants decided that Plaintiff would not be treated (or that, for non-medical reasons, the treatment would be delayed), despite the fact that they knew Plaintiff had a serious medical need for treatment (he was placed on a list for treatment because he needed treatment)." (ECF No. 7, at p. 11).  In other words, the Court found a claim against certain Doe individuals based on the Court's understanding that Plaintiff had alleged he had qualified for Harvoni treatment, yet was being denied for non-medical reasons.

Upon a closer examination in connection with this motion, the Court realizes that it misunderstood Plaintiff's allegations in his complaint.  Plaintiff was not being denied treatment for non-medical reasons: he was being delayed treatment based on a medical evaluation of his symptoms and prioritization of those needing care according to CDCR protocols.  Plaintiff's allegations concede that he was assigned the lowest level of risk based on his lab results.  His symptoms were being monitored according to established CDCR protocols.  He was never told that he qualified for immediate treatment yet failed to receive directed treatment.  Rather, his symptoms qualified him for a lower priority of treatment.

Plaintiff argues that even prioritizing patients shows deliberate indifference because every patient who could benefit from Harvoni treatment should receive it, and to not immediately provide such treatment for all is deliberate indifference.  The Court disagrees.  A constitutional claim of deliberate indifference to serious medical needs requires Plaintiff to establish that a person *subjectively* "knows of and disregards an *excessive risk* to inmate health and safety." Toguchi, 391 F.3d at 1057 (emphasis added) (citation and internal quotation marks omitted).  Plaintiff's allegations and the attached documents show that CDCR health

---

[1] Under 28 U.S.C. § 1915, "[n]otwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case *at any time* if the court determines that the action or appeal fails to state a claim upon which relief may be granted." 28 U.S.C. § 1915(e)(2)(B)(ii) (emphasis added).

services does not believe that there is an excessive risk to the health and safety of level 3 patients, like Plaintiff.  Again, the protocols explain that "Hepatitis C treatment is not an emergency.  The liver damage/scar tissue happens over many years, and some people never get much damage or scarring."  (ECF No. 1, at p. 22).   The fact that Plaintiff has had Hepatitis C for approximately 20 years confirms this.  CDCR health services has adopted complicated review, monitoring, and treatment procedures to care for such patients.  While Plaintiff may disagree with that care, the Court cannot find that Plaintiff's allegations regarding the treatment protocols sufficiently shows deliberate indifference to his serious medical needs.

## VI. RECOMMENDATIONS

Based on the foregoing, the undersigned HEREBY RECOMMENDS that:

1. Defendant Bansuan's motion to dismiss (ECF No. 18) be granted;
2. Plaintiff's Eighth Amendment claims for deliberate indifference to serious medical needs against Defendant Bansuan and Doe Defendant(s) be dismissed;  and
3. The Clerk of Court be directed to close this case.

These findings and recommendations are submitted to the United States district judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within twenty-one (21) days after being served with these findings and recommendations, any party may file written objections with the court.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within seven (7) days after service of the objections.

\\\
\\\
\\\
\\\

The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. <u>Wilkerson v. Wheeler</u>, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing <u>Baxter v. Sullivan</u>, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **April 27, 2020**                           /s/ Erica P. Grosjean
                                                          UNITED STATES MAGISTRATE JUDGE